No. 90-632

IN THE SUPREME COURT OF THE STATE OF MONTANA

1991

GARY DRILLING COMPANY,

  Plaintiff and Respondent,

  v.

THE STATE OF MONTANA DEPARTMENT
OF REVENUE; THE STATE OF MONTANA;
THE COUNTY OF YELLOWSTONE;
TREASURER OF YELLOWSTONE COUNTY;
and ASSESSOR OF YELLOWSTONE
COUNTY,

  Defendants and Appellants.

APPEAL FROM:   District Court of the Thirteenth Judicial District,
               In and for the County of Yellowstone,
               The Honorable G. Todd Baugh, Judge presiding.

COUNSEL OF RECORD:

        For Appellants:

             Paul Van Tricht (argued), Montana Department
             of Revenue, Helena, Montana; Dennis Paxinos,
             Yellowstone County Attorney, Billings, Montana;
             David W. Hoefer, Deputy County Attorney,
             Billings, Montana

        For Respondent:

             Raymond K. Peete (argued), Attorney at Law,
             Billings, Montana

                        Submitted:  September 18, 1991

                          Decided:  November 8, 1991

Filed:

_____
             Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

Respondent Gary Drilling Company (Gary) filed a complaint for declaratory judgment in the Thirteenth Judicial District Court in Yellowstone County, requesting the District Court to declare that the oil produced from certain wells should be taxed as "new production" rather than old or existing production. The District Court entered judgment in favor of Gary. The Department of Revenue, the County of Yellowstone, and the Treasurer and Assessor of Yellowstone County appeal from the District Court's decision. We affirm.

The issue presented is whether the District Court erred in determining that the oil produced from respondent's wells should be assessed as "new production" under § 15-23-601(2), MCA (1985).

The oil wells in question are located on Section 3, Township 6N, Range 32E, Yellowstone County. The mineral interests in and under Section 3 are owned an undivided 50 percent each by Ralph and Sarah Botts, husband and wife, and by the estate of Inola Botts.

In 1980, Inola Botts granted an oil and gas lease covering her mineral interests in and under all of Section 3. This lease was later assigned to Beartooth Oil & Gas Company, et al. (Beartooth). In November 1984, Ralph and Sarah Botts granted an oil and gas lease to respondent. This lease covers all of their mineral interest in and under all of Section 3, i.e., the same surface description as Beartooth's lease.

In December 1984, Beartooth began drilling a well known as Botts No. 1 in the SE¼ of the NE¼ of Section 3. This well was completed in the Amsden formation in May 1985. Botts No. 1 produced oil, in limited quantities, between January 1985 and January 1986, when it was abandoned. A total of 1258 barrels of oil were produced from Botts No. 1. Beartooth stated that the cost of drilling and operating Botts No. 1 was more than $375,000; the value of that production was in the order of about $32,000.

In early 1985, Beartooth petitioned the Montana Board of Oil and Gas Conservation to determine that the portion of Section 3 containing Beartooth's well was an appropriate well-spacing unit for oil production under § 82-11-201, et seq., MCA. In order to prevent waste of oil or gas, the Board is authorized to establish well-spacing units for any pool of oil or gas. Generally, the order establishing well-spacing units directs that only one well may be drilled and produced from the common source of supply on a spacing unit. Section 82-11-201, MCA. The Board ordered that all mineral interests in the Amsden formation underlying the E½ of the NE¼ of Section 3 were to be pooled.

Pooling is intended to provide for an equitable sharing of the oil or gas produced and the expenses of production among the persons owning interests in the pool. If an owner refuses to pay his share of the costs of a well, the Board can order his share to be paid, but only out of the production from the well. Section 82-11-202, MCA. Gary refused to pay its share of the costs from Beartooth's Botts No. 1. Gary did not bear any of the expenses of

3

Beartooth's well, except for those costs Beartooth could recover from Gary's share of the oil produced from Botts No. 1.

Gary contested the Board's pooling order. By late 1985, after it had become clear that Beartooth's Botts No. 1 well was not producing much oil, Beartooth agreed that Gary could drill an additional well in the spacing unit, and supported Gary's application for a modification of the pooling order. The Board granted Gary's application to drill an additional well in the spacing unit.

In December 1985, Gary began drilling a well known as Botts No. 2-3 in the NE¼ of the NE¼ of Section 3, about 1340 feet away from Beartooth's well. Botts No. 2-3 began producing oil in January 1986, producing more than 80,000 barrels of oil in 1986 and over 50,000 barrels in 1987.

In June 1986, Gary began drilling another well, Botts No. 1-3, in the NW¼ of the NE¼ of Section 3 (i.e., not within the well-spacing unit). This well only produced 246 barrels of oil in 1986 and 4039 barrels in 1987. Both of Gary's wells, like the Beartooth well, produced in the Amsden formation.

During the 1985 legislative session, the legislature amended the statutes governing the oil and gas net proceeds tax. 1985 Mont. Laws 695. "New production," as defined in § 15-23-601(2), MCA (1985), received favorable treatment, being taxed at seven percent of net proceeds. Section 15-23-607(2)(a), MCA (1985).

Gary believed that the production from its Botts Nos. 2-3 and 1-3 should be taxed as "new production." Appellants, tax

4

collectors for Yellowstone County and the State of Montana, thought otherwise, and classified the production from Botts Nos. 2-3 and 1-3 as existing or old production. Gary paid the net proceeds taxes to Yellowstone County under protest.

In January 1988, Gary filed a complaint for declaratory relief in the Thirteenth Judicial District Court. Gary requested the District Court to declare that the production attributable to the Ralph and Sarah Botts lease from Botts Nos. 2-3 and 1-3 was "new production" under § 15-23-601(2), MCA (1985), and that the taxes be reduced accordingly.

On September 5, 1990, the District Court entered judgment in Gary's favor. Appellants appeal from this order.

The issue in this appeal is whether the District Court erred in determining that the oil produced from Gary's wells constitutes "new production" within the meaning of § 15-23-601(2), MCA (1985).

The statute states:

> The term "new production" means the production of natural gas, petroleum, or other crude or mineral oil <u>from any lease that has not produced</u> natural gas, petroleum, or other crude or mineral oil during the 5 years immediately preceding the first month of qualified new production. [Emphasis added.]

The dispute centers around the meaning of the term "lease." Appellants contend that "lease" means "a tract of land." The Department of Revenue so defined the word "lease" in its Administrative Regulations, e.g., 42.25.1001(1), ARM (1985). Under the Department of Revenue's interpretation, Gary's production would not be "new production," because Beartooth produced oil from the same tract of land within the preceding five years.

Gary contends, and the District Court agreed, that "lease" means "a contract or legal arrangement," under which Gary was permitted to go on the land and drill for oil. By this definition, Gary's production was "new production" because Gary drilled its wells under a separate contractual agreement.

We are persuaded that the word "lease," as used in this statute, refers to the contract or legal arrangement giving the driller the right to go on the land and drill for oil. The "lease" is not "the land," but is a separate interest. This definition is consistent with customary usage in the oil and gas industry. Williams' and Meyers' Manual of Oil and Gas Terms defines lease as: "(1) The conveyance of a nonfreehold interest in land. (2) The instrument by which a leasehold or working interest is created in minerals." 8 Williams and Meyers, Oil and Gas Law 503-04 (1987). Further, by so construing the word "lease" in the instant case, we effectuate the legislature's public policy of encouraging new production on newly leased lands.

Alternatively, the Department of Revenue contends that the prior production from Beartooth's well should be attributed to Gary by virtue of the pooling order issued by the Board of Oil and Gas Conservation. As authority for this contention, the Department of Revenue cites three sections of Title 82, ch. 11, MCA (Oil and Gas Conservation), §§ 82-11-202(1), -211(1), and -212, MCA. We note, however, that these statutes are specifically concerned with oil and gas conservation and the prevention of waste, rather than taxation. The portions of the statutes cited by the Department of

6

Revenue were all enacted several years before the 1985 amendments of § 15-23-601(2), MCA, distinguishing "new production" from existing production, and it does not appear that the earlier conservation statutes were drafted in contemplation of a later statute containing a new classification of oil production for tax purposes. We conclude that the cited statutes are not helpful in construing the tax statute at issue in this case.

Gary contends, and we agree, that it is unfair to penalize Gary economically for Beartooth's production since Gary did not receive any benefit from Beartooth's production, and in fact, refused to participate in it. Beartooth's Botts No. 1 well was drilled by a different operator under a separate contractual agreement, executed several years before Gary's lease agreement. Gary had no right or ability to control Beartooth's operations. Gary did not join in drilling Beartooth's well, and received no economic benefit from it. Gary was the sole operator of its own wells under a separate lease. We agree with the District Court that Beartooth's production should not be charged to Gary. The oil produced from Gary's Botts Nos. 2-3 and 1-3 wells was production from a new lease which had not produced during the first preceding five years. The District Court correctly determined that the production from Gary's wells constituted "new production" under § 15-23-601(2), MCA (1985).

Affirmed.

_____
Justice

7

We concur:

_____
                 Chief Justice

*John Conway Harrison*

*William E Hunt Sr*

*Karla M. Gray*

_____

                 Justices

8

Justice R. C. McDonough respectfully dissents.

The general oil and gas net proceeds tax, which is involved here, is in lieu of a year-to-year ad valorem property tax on the oil and gas in the ground. The actual tax is arrived at by applying the applicable local millage against 100% of the net proceeds value of the produced oil and gas. The specific sections involved were an exception to the application of the general net proceeds tax and provided that net proceeds for new production would be considered as the equivalent of the gross sale proceeds, and instead of applying the local millage rate to the net proceeds value, however defined, levied a straight seven percent tax against the gross sale proceeds. See § 15-23-607, MCA (1985). The taxation of "new production" is an exception to the general law taxing net proceeds of oil and gas. See the first sentences of §§ 15-23-602 and-603, MCA (1985).

The statute at issue, § 15-23-601, MCA (1985), reads as follows:

> (2)  The term "new production" means the <u>production</u> of natural gas, petroleum, or other crude or mineral oil <u>from any lease</u> that has not produced natural gas, petroleum, or other crude or mineral oil during the 5 years immediately preceding the first month of qualified new production.  (Emphasis added.)

Webster's Seventh <u>New Collegiate Dictionary</u>, p. 480 states:

> **lease** \'les\n 1 : a contract by which one conveys real estate for a term of years or at will usu. for a specified rent; also : the act of such conveyance or the term for which it is made 2 : a piece of land or property that is leased.

We have previously said that when a taxing statute is

9

susceptible to two constructions and legislative intent is in doubt, relative to exemptions and deductions, the construction is to be against the taxpayer and in favor of the taxing power. See, State ex rel. Anderson v. State Board of Equalization (1957), 133 Mont. 8, 13, 319 P.2d 221; Anaconda Co. v. Dept. of Revenue (1978), 178 Mont. 254, 258, 583 P.2d 421, citing Anderson.

I realize that we are dealing with an exception and not a deduction or an exemption, but it is, in essence, the same because it is a net reduction of the general net proceeds tax. The maxim: "Where the reason is the same, the rule should be the same," applies here. See § 1-3-202, MCA.

If there is a doubt as to legislative intent then this being an exception, such words should be construed against the taxpayer. Specifically, what is not clear is the meaning of the word "lease" if one looks at it in isolation but when used in the context of "production of natural gas, petroleum, or other crude or mineral oil from any lease" it becomes clear. The word "from" refers to the source. Oil and gas are produced from a place, real property and premises. For an example, the oil and gas leases involved herein and agreements of the lessees herein, provide in their text for oil and gas produced and saved from the premises. Oil and gas are not produced from a written instrument or lease; if it were to be from a written lease, it would be production under or by virtue of a lease.

The effect of the majority's construction is to give tax reductions on new production to those who have multiple written

10

leases with production coming from the same place. For example, if minerals in the ground in a piece of land are owned by ten different owners as co-tenants, each gives a different written lease to a lessee or even the same lessee, such lessees then complete nine different additional development wells for each written lease adjacent to a producing well from the same vertical formation and pool. The nine wells would have the advantage of the tax reduction. However, a lessee who has one written lease covering two pieces of land, with a well on each, one five miles away from the other on an entirely different geological structure, would not receive the tax reduction even though the second well would be geologically considered new production and the second well would be an expensive exploratory wildcat well and would open up a new field. Rules of construction and logic support the reversal of the District Court.

_____
                                                    Justice

Chief Justice J. A. Turnage:

I concur in the dissent of Justice McDonough.

_____
                        Chief Justice

11